APPROVED: _____

SHAWN G. CROWLEY / REBEKAH DONALESKI
Assistant United States Attorneys.

BEFORE:   THE HONORABLE HENRY B. PITMAN
          United States Magistrate Judge
          Southern District of New York

**16 MAG 6679**

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :     **SEALED COMPLAINT**

          - v. -                  :     Violations of
                                        21 U.S.C. §§ 963 & 959;
SHAHBAZ KHAN,                     :     18 U.S.C. § 3238

          Defendant.             :

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     PAUL T. LARSEN, being duly sworn, deposes and says that he
is a Special Agent of the Drug Enforcement Administration
("DEA"), and charges as follows:

## COUNT ONE
### (Narcotics Importation Conspiracy)

     1.   From at least in or about August 2016, up to and
including in or about October 2016, in the Southern District of
New York and elsewhere, and in an offense begun and committed
out of the jurisdiction of any particular State or district,
SHAHBAZ KHAN, the defendant, who is expected to be first brought
to and arrested in the Southern District of New York, and whose
point of entry into the United States is expected to be in the
Southern District of New York, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate,
and agree to violate the narcotics laws of the United States.

     2.   It was a part and an object of the conspiracy that
SHAHBAZ KHAN, the defendant, and others known and unknown, would
and did distribute, and possess with intent to distribute, a
controlled substance, to wit, one kilogram and more of mixtures
and substances containing a detectable amount of heroin,
intending, knowing, and having reasonable cause to believe that
such substance would be unlawfully imported into the United
States from a place outside thereof, in violation of Sections

812, 959(a), 959(d), 960(a)(3), 960(b)(1)(B), and 963 of Title 21, United States Code.

(Title 21, United States Code, Sections 963 and 959(d); Title 18, United States Code, Section 3238.)

## COUNT TWO
### (Attempted Narcotics Importation)

3.      From at least in or about August 2016, up to and including in or about October 2016, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, SHAHBAZ KHAN, the defendant, who is expected to be first brought to and arrested in the Southern District of New York, and whose point of entry into the United States is expected to be in the Southern District of New York, intentionally and knowingly did attempt to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, from a place outside thereof, in violation of Sections 959(a) and 963 of Title 21, United States Code.

4.      The controlled substance involved in the offense was one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Sections 812, 960(a)(3), and 960(b)(1)(B) of Title 21, United States Code.

(Title 21, United States Code, Sections 963 and 959(d); Title 18, United States Code, Section 3238.)

The bases for my knowledge and the foregoing charges are as follows:

5.      I have been a DEA Special Agent since 1999.  I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities.  During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics traffickers operate, and have participated in numerous investigations involving international drug trafficking.  I have been personally involved in the investigation of this matter. This affidavit is based on my communications with other law enforcement officers and other individuals, and on my review of various reports and records.  Because this affidavit is being

2

submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all of the facts that I have learned during the course of the investigation.   Where the contents of communications with others and statements by others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

6.    As set forth in greater detail below, since at least August 2016, SHAHBAZ KHAN, the defendant, and others known and unknown, have conspired to import large quantities of heroin into the United States. Over the past three months, KHAN has participated in recorded meetings and telephone calls with four individuals whom KHAN understands to be affiliated with an international drug trafficking organization, for the purpose of arranging to import heroin into the United States.   Three of these individuals are, in fact, DEA confidential sources ("CS-1," "CS-2," and "CS-3," and, collectively, the "CSes"[1]).   The fourth individual is, in fact, an undercover law enforcement officer (the "UC").

7.    In early August 2016, CS-1 and CS-2 met with SHAHBAZ KHAN, the defendant, in a country in Southwest Asia ("Country-1").   See infra ¶¶ 13,14.   During the meeting, CS-1 informed KHAN that CS-1 had a customer in New York City, who was interested in purchasing heroin from KHAN for importation into the United States. KHAN agreed to provide heroin to CS-1's customer for shipment to New York City.   Following the meeting,

---

[1] CS-1 has been a paid DEA source since approximately 2007. Information provided by CS-1 has proven reliable and has been corroborated by independent evidence, including audio/video recordings and other source information.

CS-2 has been a paid DEA confidential source since in or about June 2016. Information provided by CS-2 has proven reliable and has been corroborated by independent evidence, including audio/video recordings and other source information.

CS-3 has been a paid DEA source since approximately 1999. Information provided by CS-3 has been corroborated by independent evidence, including audio/video recordings and other source information.

CS-1 and CS-2 maintained contact with KHAN by telephone to arrange a meeting between KHAN and the New York-based customer. See infra ¶ 15.

8.    In early September 2016, SHAHBAZ KHAN, the defendant, communicated with the UC by telephone. See infra ¶ 15.d.  KHAN understood the UC to be CS-1's narcotics-trafficking customer in New York, New York.  During the calls, KHAN and the UC discussed, among other things, meeting to arrange the importation of heroin into the United States.

9.    In late September 2016, SHAHBAZ KHAN, the defendant, met with the UC and the CSes in a country in Asia ("Country-2"). See infra ¶¶ 16-18.  KHAN understood CS-3 to be the UC's narcotics-trafficking partner in the United States.  During the meeting, KHAN agreed to provide heroin to the UC and CS-3 for importation into the United States.  The parties agreed that, in the coming weeks, KHAN would provide five kilograms of heroin to CS-1 in Country-1 (the "Initial Heroin Shipment").  The UC would then have the Initial Heroin Shipment transported from Country-1 and imported into New York, New York.  Following the successful importation of the Initial Heroin Shipment into the United States, KHAN would partner with the UC to import larger quantities of heroin into the United States (the "Heroin Importation Partnership").

10.   In early October 2016, SHAHBAZ KHAN, the defendant, communicated by telephone with the UC to arrange for the transportation of the Initial Heroin Shipment to a city in Country-1 ("City-1").  See infra ¶ 18.  On or about October 11, 2016, CS-1 and CS-2 met with one of KHAN's employees (the "Courier") in City-1. See infra ¶ 19.  The Courier provided CS-1 and CS-2 with the Initial Heroin Shipment.

11.   On October 12, 2016, at the direction of the DEA, CS-1 wired money to an account controlled by SHAHBAZ KHAN, the defendant, as payment for the Initial Heroin Shipment (the "Payment").  See infra ¶ 20.  Following receipt of the Payment, KHAN communicated with the UC by telephone. See infra ¶ 21. KHAN confirmed that he had received the Payment and conveyed that he wished to continue with the Heroin Importation Partnership.

## The Investigation

12.   Based on my participation in this investigation, my conversations with other law enforcement officers involved in

this investigation, and my review of DEA reports, I have learned, among other things, the following:

a.    In or about July 2016, CS-1 and CS-2, at the DEA's direction, met with an associate of SHAHBAZ KHAN, the defendant, ("CC-1") in Country-1.  During the meeting, CS-1 and CS-2 conveyed to CC-1 that they knew KHAN to be a narcotics trafficker and that they were interested in working with KHAN in the narcotics-trafficking business.  CS-1 and CS-2 asked CC-1 to arrange a meeting between CS-1, CS-2, and KHAN.  CC-1 subsequently provided KHAN with the telephone numbers for CS-1 and CS-2.

b.    Throughout July and early August 2016, CS-1 and CS-2, at the direction of the DEA, participated in a series of recorded telephone calls with KHAN.  During those calls, KHAN stated, in sum and substance, that he would travel to Country-1 to meet with CS-1 and CS-2.

**August 6 and 7, 2016:   The Defendant Meets with CS-1 and CS-2**

13.    On or about August 6, 2016, SHAHBAZ KHAN, the defendant, traveled to Country-1 to meet with CS-1 and CS-2. CS-1 and CS-2, at the DEA's direction, spent two days with KHAN, during which time the parties discussed, among other things, KHAN's involvement in narcotics trafficking.

14.    On or about August 7, 2016, CS-1 and CS-2 participated in a conversation with SHAHBAZ KHAN, the defendant, which was audio-recorded (the "August 7, 2016 Conversation").  Based on my review of DEA reports, a transcript reflecting a draft translation of the August 7, 2016 Conversation,[2] and my conversations with the UC, I have learned that, during the August 7, 2016 Conversation, the following was discussed, in substance and in part:

a.    CS-1 informed KHAN that CS-1 had a customer in the United States (i.e., the UC) who wanted to purchase heroin from KHAN for importation into the United States and re-sale in the New York City area.  CS-1 stated, in sum and substance:  "We have a person; we have customer in the U.S. . . . For the first time they only want 4 to 5 . . . . For the rest of the time he will ask for 300 per week – do you know what I'm saying?"[3]  Based

_____

[2] The August 7, 2016 Conversation between KHAN and CS-1 and CS-2 was conducted principally in Pashtu, which I do not speak.

[3] All quotations in this Complaint drawn from meetings and

on my training and experience, and participation in this
investigation, I believe that CS-1 is explaining to KHAN that
the UC would begin by purchasing from KHAN between four and five
kilograms of heroin for importation into the United States
(*i.e.*, the Initial Heroin Shipment).[4]  Once the UC had received
and re-sold the Initial Heroin Shipment, the UC would begin
purchasing from KHAN approximately 300 kilograms of heroin per
week for importation into the United States (*i.e.*, the Heroin
Importation Partnership).

        b.     KHAN conveyed to CS-1 and CS-2 that KHAN could
transport the heroin to the United States by plane or by ship.[5]
KHAN explained that he would first have the heroin transported
from Country-1 to a port in another country in Southwest Asia
("Country-3").  KHAN stated that, from Country-3:  "we can ship
them to wherever they want us to ship; whether they want Canada,
USA, or anywhere else in the world.  All they do is, they give
us the address of the company, we will send them there.  The
plane and the container will go there."  KHAN explained that,
once the heroin arrived at a port in the United States, the UC
would be responsible for offloading it.  CS-1 confirmed:
"[s]hipping place is in your hands; receiving belongs to them
[*i.e.*, the UC]."

        c.     KHAN indicated that one of his relatives
("Relative-1") would assist with the importation of heroin into
the United States ("[Relative-1] is in Dubai right now.  He has
a U.S. visa that is valid for 5 years.  He can travel to the
U.S. too.")  CS-1 asked:  "And there is no difference in his
words and your words, is there?  Is his decision your decision?"
and KHAN responded:  "There is no difference.  It is all one
word.  He is my [relative] . . . . He also knows everything."

---

telephone calls are based on a review of audio recordings and/or
preliminary draft transcripts, summaries, and translations, and
are thus subject to revision upon the preparation of finalized
transcripts and translations.

[4] The interpretations of such language set forth in this
Complaint are based on my training, experience, and
participation in this investigation.

[5] KHAN referred to the heroin as "maal," which means "product" or
"stuff" in Pashtu.  Based on my training and experience and
participation in this investigation, I know that the word "maal"
is used by drug traffickers in Country-1 as a code word for
heroin.

d.   CS-1 agreed to arrange a meeting between the UC and KHAN in another country to finalize the Initial Heroin Shipment and the Heroin Importation Partnership.  CS-1 stated that s/he would be present at the meeting.  KHAN informed CS-1 that, if the UC could not travel outside the United States, the meeting could take place in New York and that Relative-1 would attend in KHAN's place ("Tell him that we can do it in your city [*i.e.*, New York City].  [Relative-1] already has a visa.  He can come to the U.S.")

**August and September 2016:   Communications with the Defendant**

15.   Based on my review of DEA reports and draft translations of summaries of consensually recorded telephone calls between the CSes and SHAHBAZ KHAN, the defendant, and my conversations with the UC, I have learned, among other things, the following:

a.   In or about August 2016, at the direction of the DEA, CS-1 and CS-2 maintained contact with KHAN through a series of recorded telephone calls.  During the calls, KHAN discussed with CS-1 and CS-2, among other things, traveling to another country to meet with the UC to finalize the Heroin Importation Partnership.

b.   On or about August 29, 2016, during a recorded telephone call, CS-1 conveyed to KHAN that CS-1 was in a country in the Middle East ("Country-4").  KHAN replied that Relative-1 was also in Country-4 and stated:  "Why don't you see [Relative-1]?  If you need clothes there, I can take care of you."  Based on my training, experience, and participation in this investigation, I believe that KHAN used "clothes" as a code word for heroin.

c.   On or about September 2, 2016, during a recorded telephone call, CS-1 informed KHAN that CS-1 had provided the UC with KHAN's telephone number and that the UC would be calling KHAN soon.

d.   Later in September 2016, the UC had a series of recorded telephone calls with KHAN.  KHAN understood the UC to be CS-1's customer in the United States, who was interested in purchasing heroin from KHAN.  During the calls, the UC and KHAN discussed, among other things, arranging to meet in Country-2.

**September 29 – October 1, 2016: Meetings with the Defendant,
the UC and the CSes**

16.   On or about September 29, 2016, SHAHBAZ KHAN, the
defendant, traveled to Country-2.   Over the course of three
days, the UC and the CSes had several meetings with KHAN, during
which they discussed, among other things, the Initial Heroin
Shipment and the Heroin Importation Partnership.   The first
meeting occurred on or about September 29, 2016 (the "September
29, 2016 Meeting").   I, along with other law enforcement
officers, conducted surveillance of portions of the September
29, 2016 Meeting, which was audio-recorded.   Based on my review
of DEA reports and a summary of draft translations of the
September 29, 2016 Meeting,[6] as well as my conversations with the
UC, I have learned that during the September 29, 2016 Meeting,
the following was discussed, in substance and in part:

        a.   The UC informed KHAN that the UC is from New York
City.

        b.   The UC introduced CS-3 as the UC's partner in the
UC's narcotics trafficking business.   The UC told KHAN that the
UC and CS-3 previously trafficked large quantities of cocaine
from South America to the United States.   The UC stated that CS-
3 had been responsible for transporting the cocaine from South
America to New York and smuggling the cocaine through customs at
various ports of entry in the United States.

        c.   The UC informed KHAN that the UC and CS-3 were no
longer involved in trafficking cocaine from South America, but
were now interested in "bringing products from this side" –
which I understand to mean trafficking heroin from Country-1 to
New York.   The UC explained that, in New York, selling heroin
from Country-1 is more profitable than selling cocaine from
South America.   The UC informed KHAN that a kilogram of heroin
from Country-1 is sold for approximately $65,000 in New York
City.   The UC later informed KHAN that a kilogram of "high
quality injectable heroin" is sold for approximately $70,000 in
New York City.

        d.   KHAN explained that he (KHAN) transports
narcotics from Country-1 to other countries by, among other
ways, shipping it onboard large container ships.   The UC asked

---

[6] The September 29, 2016 Meeting was conducted principally in
Pashtu.   From time to time during the course of the meeting, the
parties spoke in English.

8

KHAN if KHAN could send container ships containing heroin to the
United States and KHAN replied, in sum and substance:  "wherever
you give me an address, [I] . . . will ship it there.  If you
tell me America, I will send it to America."  KHAN explained
that, once the cargo ships arrived at ports in the United
States, the UC and CS-3 would be responsible for offloading it.

          e.    KHAN informed the UC and CS-3 that Relative-1 is
involved in narcotics trafficking, and suggested that the UC and
CS-3 communicate with Relative-1 to coordinate future narcotics
transactions.

          f.    KHAN agreed to provide the UC with five kilograms
of heroin – i.e., the Initial Heroin Shipment – for importation
into the United States.  KHAN informed the UC that, after the
Initial Heroin Shipment arrived in New York, KHAN would partner
with the UC to import larger quantities of heroin into the
United States (i.e., the Heroin Importation Partnership).

     17.   On or about September 30, 2016, SHAHBAZ KHAN, the
defendant, met with the UC and the CSes in Country-2 (the
"September 30, 2016 Meeting").  I, along with other law
enforcement officers, conducted surveillance of portions of the
September 30, 2016 Meeting, which was audio-recorded.  Based on
my review of DEA reports and a summary of draft translations of
the September 30, 2016 Meeting,[7] as well as my conversations with
the UC and the CSes, I have learned that during the September
30, 2016 Meeting, the following was discussed, in substance and
in part:

          a.    The UC asked KHAN, in sum and substance, what was
the purity of the heroin KHAN would provide to the UC.
Thereafter, KHAN placed a call on his cellular telephone to
another of his relatives ("Relative-2").  During the call, KHAN
asked, in substance and in part:  "What's the purity of the
white stuff?"  Based on my training and experience, and
participation in this investigation, I believe that "white
stuff" refers to heroin.  KHAN then hung up the phone and
informed the UC that Relative-2 had reported that the heroin was
100% pure.  Sometime later, KHAN spoke with Relative-2 again by
phone.  Following KHAN's conversation with Relative-2, KHAN

---

[7] The September 30, 2016 Meeting was conducted principally in
Pashtu.  From time to time during the course of the meeting, the
parties spoke in English.

informed the UC that the price of one kilogram of heroin in Country-1 was approximately $4,000.

b.      The parties agreed that the UC would pay KHAN approximately $4,000 per kilogram of heroin for the Initial Heroin Shipment.

c.      KHAN agreed to have the Initial Heroin Shipment delivered to CS-1 and CS-2 in a city in Country-1 (i.e., City-1) on or about October 10, 2016.  The UC confirmed that, once CS-1 and CS-2 had received the Initial Heroin Shipment in City-1, the UC would have it transported to the United States.

d.      The parties discussed the method by which the UC would transport the Initial Heroin Shipment from Country-1 to the United States.  KHAN asked the UC if the UC knew any American contractors who worked at United States military bases in City-1.  The UC answered affirmatively, and KHAN suggested that the UC pay the contractors to smuggle the Initial Heroin Shipment onto United States military cargo planes for shipment to the United States.  The UC confirmed that the UC would do so.

e.      KHAN and the UC agreed that, after the Initial Heroin Shipment arrived in New York, New York, KHAN would continue to provide the UC with larger quantities of heroin on a consistent basis for importation into the United States.  KHAN stated that, in contrast to the Initial Heroin Shipment, KHAN would provide the transportation of future shipments of heroin from Country-1 to the United States.

## October 10, 2016: The Defendant Arranges for the Importation of Heroin into the United States

18.      Based on my conversations with the UC, and my review of DEA reports and draft translations of summaries of consensually recorded telephone calls between the UC and SHAHBAZ KHAN, the defendant, I have learned that the following events occurred on October 10, 2016, among others:

a.      Early in the morning, during a recorded telephone call, the UC informed KHAN that CS-1 and CS-2 were prepared to travel to City-1 to "finish that work," i.e., pick up the Initial Heroin Shipment.  KHAN indicated that the Initial Heroin Shipment was ready, but that his relative, who was responsible for transporting the Initial Heroin Shipment to City-1, needed an additional day to arrange for the transport.  The UC told KHAN that CS-1 and CS-2 would be ready to pick up the Initial Heroin Shipment in City-1 on October 11, 2016.

b.    Later on or about October 10, 2016, CS-1 and CS-2 met with KHAN in City-1.  During the meeting, which was audio-recorded, KHAN informed CS-1 and CS-2 that KHAN's employee (*i.e.*, the Courier) was on his way to City-1 with the Initial Heroin Shipment.  KHAN told CS-1 and CS-2 that KHAN had provided the Courier with their telephone numbers, and indicated that the Courier would call CS-1 and CS-2 when the Courier arrived in City-1.

c.    On the evening of October 10, 2016, CS-1 received a telephone call from an individual who identified himself as the Courier.  The Courier informed CS-1, in sum and substance, that the Courier had arrived in City-1, but that, because it was nighttime, the Courier did not feel comfortable delivering the Initial Heroin Shipment to CS-1 and preferred to wait until the following morning.  CS-1 and the Courier agreed to meet the following morning at a certain location in City-1 (the "Location").

d.    Later on October 10, 2016, during a recorded telephone call, the UC asked KHAN where the UC should send the payment for the Initial Heroin Shipment – *i.e.*, the Payment. KHAN instructed the UC to have the Payment wired to an account KHAN controlled in City-1 (the "KHAN Account").

### October 11 and 12, 2016: The Defendant Supplies Heroin for Importation into the United States

19.    Based on my communications with the UC, and my review of DEA reports and draft translations of summaries of consensually recorded telephone calls between the UC and SHAHBAZ KHAN, the defendant, I have learned that the following events occurred on October 11, 2016, among others:

a.    CS-1 and CS-2 traveled to the Location.  Once there, CS-2 met with an individual who identified himself as the Courier.  The Courier subsequently provided CS-2 with five plastic packages containing a white powdery substance (the "Packages").  The words "Aziz Khan" and the number 31 were written on each of the Packages.

b.    CS-1 and CS-2 later provided the Packages to DEA agents.  One of the Packages was field-tested and tested positive for the presence of heroin.  The total weight of the Packages was approximately five kilograms.

20.    Based on my communications with the UC, and my review of DEA reports and draft translations of summaries of

consensually recorded telephone calls between the UC and SHAHBAZ KHAN, the defendant, I have learned that the following events occurred on October 12, 2016, among others:

> a.    The UC participated in two recorded telephone calls with KHAN.  During the calls, the UC conveyed to KHAN that CS-1 had successfully retrieved the Initial Heroin Shipment from the Courier.  KHAN replied that the UC should now "focus on the future work," which I believe refers to the Heroin Importation Partnership.  The UC further informed KHAN that the UC had instructed CS-1 to wire the Payment to the KHAN Account.  KHAN confirmed that KHAN would leave City-1 after KHAN had received the Payment.

> b.    At the direction of the DEA, CS-1 wired the Payment to the KHAN Account.

### October 14 and 15, 2016:  The Defendant Discusses Further Importation of Heroin into the United States

21.    Based on my communications with the UC, and my review of DEA reports and draft translations of summaries of consensually recorded telephone calls between the UC and SHAHBAZ KHAN, the defendant, I have learned, among other things, the following:

> a.    On or about October 14, 2016, the UC, while in New York, New York, placed a recorded call to KHAN.  During the call, the following was discussed, in substance and in part:

>> i.    The UC informed KHAN that the UC had been traveling, but that the UC had just arrived home in New York, New York.

>> ii.    KHAN confirmed that KHAN had received the Payment.

>> iii.    KHAN told the UC that the UC should now "focus on the future work."

> b.    During a recorded call on October 15, 2016, KHAN asked the UC, in substance and in part, whether there were "any updates" concerning when the Initial Heroin Shipment would arrive in New York, New York.  The UC told KHAN that there were no updates, but that as soon as the Initial Heroin Shipment arrived in New York, the UC would inform KHAN.

WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of SHAHBAZ KHAN, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

PAUL T. LARSEN
Special Agent
Drug Enforcement Administration

Sworn to before me this
19th day of October, 2016

THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

13